UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JEANNE SPENCER, | : | Case No. 1:09cv096 |
| Plaintiff, | : | Chief Judge Dlott |
| v. | : | ORDER GRANTING IN PART AND DENYING IN PART |
| NATIONAL CITY BANK, et al., | : | DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| Defendants. | | |

This matter is before the Court on Defendants' Motion for Summary Judgment. (Doc. 22.) Plaintiff Jeanne Spencer brought this action against her former employer, National City Bank ("National City" or the "Bank"), and its parent company, The PNC Financial Services Group, Inc. (collectively, "Defendants") asserting claims for age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621 *et seq.*, and Chapter 4112 of the Ohio Revised Code. Plaintiff also asserts claims for disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Chapter 4112 of the Ohio Revised Code. Plaintiff further alleges claims for interference and retaliation in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2611. Finally, Plaintiff asserts a claim for defamation per se.

Defendants move for summary judgment on all of Plaintiff's claims. Plaintiff has not disputed Defendants' motion as to the FMLA interference and defamation claims. (Doc. 26.) Plaintiff opposes Defendants' motion on the remaining claims. For the reasons that follow, the Court **GRANTS** Defendants' motion for summary judgment as to the FMLA interference and

defamation claims and **DENIES** Defendants' motion for summary judgment as to the remaining claims.

## I. BACKGROUND[1]

The facts of this case arise from Plaintiff's resignation in lieu of termination from her employment at National City. Plaintiff, born in 1946, worked as a Customer Services Representative ("CSR"), or teller, at National City's retail branch office in Brentwood, Ohio ("Brentwood Branch"). She was hired as a CSR in 2001,[2] was promoted to Senior CSR in 2005, and worked in that capacity until she resigned in lieu of termination, effective February 1, 2008, when she was 61 years old.

### A. Plaintiff's Meniere's Disease

Prior to her employment with National City, Plaintiff was diagnosed with Meniere's Disease. This disorder affects Plaintiff's hearing and balance, resulting in constant tinnitus and episodes of vertigo. (*Id.* at 124:9-11.) Meniere's Disease also causes progressive hearing loss and, as a result, Plaintiff is deaf in her left ear and has reduced hearing in her right ear. (*Id.* at 44:14-45:3; 74:4-10.) Four or five times per year, Plaintiff experiences severe episodes where she is not able to stand or eat, and is extremely sensitive to light. (*Id.* at 124:24-125:22.) Outside of these extreme episodes, Plaintiff can drive a car, walk five blocks, grocery shop, perform household chores, and exercise at a gym.

---

[1] Except as otherwise indicated, background facts are taken from Defendants' Proposed Statement of Undisputed Facts (doc. 22-2) to the extent they are admitted by Plaintiff in Plaintiff's Response to Defendants' Proposed Undisputed Facts (doc. 26-3). To the extent the parties do not explicitly agree on any statement of fact, the Court cites to the portion of the record providing support for the statement.

[2] Plaintiff was originally hired by Provident Bank. (Spencer Dep. Ex. 5.) National City acquired Provident Bank in 2004. (*Id.* at 96:10-13.)

B.     **Plaintiff's Employment with the Bank**

As a CSR, Plaintiff was responsible for balancing her cash drawer at the end of each day and meeting sales, referral and customer services goals, among other things.  (*Id.* at 41-42.)  Plaintiff informed the Bank of her Meniere's Disease and requested that she be able to sit in a chair while she worked.  Plaintiff testified that she raised the issue of her hearing loss with her superiors and that they subsequently placed her at a branch where the "noise level was not so great." (*Id.* at 119:16-20.)  In seven years of employment with the Bank, Plaintiff missed only a couple of days of work because of her Meniere's Disease.

Although Plaintiff received multiple honors for exceeding her referral goals and for outstanding customer service (Justice Dep. 55:4-56:9; Burchett Dep. 93:4-94:3), Plaintiff admittedly struggled with balancing her cash drawer.  The Bank's written policies required managers to perform audits on each CSR's assigned cash drawer to ensure that CSRs were maintaining accurate records and not diverting funds.  Each branch office was required to conduct at least one surprise audit on each CSR's cash drawer on a quarterly basis and one monthly random surprise audit of a CSR's cash drawer.  Additional surprise audits could be performed "at the discretion of the Branch Manager or Retail Manager."  (Doc. 26 Ex. A.)  If the amount of cash in the CSR's drawer did not equal the amount reflected on the Bank's computer system, this would be termed a "shortage" or "outage."

CSRs' outages were tracked on a yearly rolling basis.  (Perko Decl. Ex. 3)  If an employee's outages reached a Level 1 loss (between $200 - $499.99) or a Level 2 loss (between $500 - $999.99), the Bank's guidelines recommended that the employee be given a verbal or written warning.  If an employee's outages reached a Level 3 loss (between $1,000 - $1,599.99) or a Level 4 loss ($1,600 or greater), the Bank's guidelines provided that "probation or termination should be considered."  (Spencer Dep. Ex. 20.)

### C. Plaintiff's First Probationary Period

Between August 7, 2001 and November 19, 2004, the Bank issued six separate written "corrective actions" to Plaintiff and eventually placed Plaintiff on probation for outages, balancing differences, and other policy violations. Many of the corrective actions, which were issued by multiple supervisors, explicitly state that Plaintiff's position could be terminated if Plaintiff continued to sustain outages. (*Id.* Exs. 7, 9.) Plaintiff does not dispute any of these corrective actions, nor does she claim that they were discriminatory. In fact, in her 2004 self assessment, Plaintiff wrote: "I need to cut-down (stop) any errors I hastily make . . . . I need to be more consistent with my balancing." Despite her issues with balancing, Plaintiff was promoted to Senior CSR in 2005.

### D. Plaintiff's Second Probationary Period

At the end of 2005, Plaintiff received a corrective action because she was out of balance; a surprise audit raised her rolling year-to-date shortage to a Level 2 loss. In May of 2006, then Branch Manager Mark Burchett issued Plaintiff her second probationary notice because her rolling loss balance had reached $3,164.58, a Level 4 loss. The probationary notice provided that if Plaintiff's losses increased by $200 or more, Plaintiff would "face further corrective action up to and including termination." (*Id.* Ex. 22.)

### E. Plaintiff's Third Probationary Period

By the beginning of 2007, Plaintiff's losses persisted and her rolling loss balance reached $4,976.89, a Level 4 loss. At this time, Burchett considered terminating Spencer's employment, but instead opted to place Plaintiff on her third probationary period in an effort to give Plaintiff "a chance to correct [her] behaviors." (Burchett Dep. 75:15-16.) The probationary notice read, "Demonstration of immediate, continuous and sustained improvement is required. Failure to meet expectations may result in termination of your employment." (Spencer Dep. Ex. 24.)

4

### F.      New Management—and Fourth Probationary Period

Soon after that occurrence, in May of 2007, the Bank terminated Burchett and assigned Kathleen Perko to the position of Branch Manager of the Brentwood Branch.[3]  Perko instituted a number of new policies at the Brentwood Branch.  (Perko Dep. 75:19-76:6.)  First, Perko implemented "3-3-4 Quick Audits," which were performed on tellers to ensure that each teller had only $3,000 in the top drawer, $3,000 in the middle drawer, and $4,000 in the coin vault.  Perko also created biweekly coaching sessions, in which an employee's strengths and areas of improvement would be discussed.  (*Id*. at 30: 14-17.)  Additionally, Perko created a Critical Incident Log, a file that was used to document various policy violations.  (*Id*. at 76:1-77:18.)

Although the exact timeframe is unclear from the record, Plaintiff claims that soon after Perko's arrival she was subjected to substantial scrutiny.  For example, Plaintiff claims that she was subjected to significantly more audits than her younger coworkers once Perko arrived.  (*Id*.)  The parties appear to dispute the total number of audits performed on Plaintiff's cash drawer.  The Bank maintained a "Surprise Audit Control Log," which recorded the Brentwood Branch's quarterly surprise audits and random monthly audits.  (Spencer Dep. Ex. 31.)  According to the Log, the Bank conducted four quarterly surprise audits and two scheduled surprise audits on Plaintiff's drawer in 2007.[4]  (*Id*.)  The Log does not include the total number of 3-3-4 Quick Audits, nor does it document additional surprise audits performed on the CSRs' drawers.  (*See id.*)

---

[3]  Burchett was terminated for "failure to meet unit goals."  (Burchett Dep. 36:19-20.) Burchett initially filed a charge with the Equal Employment Opportunity Commission alleging age discrimination.  (*Id*. at 37:2-38:11.)  Burchett's allegations were determined to be "unfounded" and Burchett testified that he now believes his termination was justified and that he was simply "mad" at the time he file the EEOC charge.  (*Id*. at 38:16-17.)  Coincidentally, Burchett is currently a Branch Manager at PNC Bank in West Chester.  (*Id*. at 7:17-24.)

[4] February 8, 2007 and August 14, 2007.

The record shows that Plaintiff received at least three, and possibly four, 3-3-4 Quick Audits in August of 2007.[5] Another CSR, Maria Ahmed, who worked at the Bank while Perko was Branch Manager, testified that she did not recall ever receiving a 3-3-4 Quick Audit. (Ahmed Dep. 24:2-5.) Plaintiff's drawer was not in compliance during two of these 3-3-4 Quick Audits and, consequently, the Bank issued Plaintiff a "Performance Improvement Directive Counseling and Action Plan" on August 14, 2007 and August 17, 2007. (Spencer Dep. Exs. 26, 28.) Both written counselings indicate that Plaintiff's drawer would be further audited to monitor improvement. (*Id.*) The written counselings also state: "Failure to meet expectations may result in probationary disciplinary action or termination of your employment." (*Id.*)

On August 10, 2007, Plaintiff sustained an outage of $733.00, which brought her rolling losses for the year to $2,408.57, a Level 4 loss. (*Id.* Ex. 33.) Following this loss, Perko contacted the Bank's Human Resources Department, which recommended a fourth probationary period for Plaintiff. (Perko Dep. 58:24-60:8; Patterson Dep. Ex. 1.) The probationary notice provided, in relevant part:

> If [Plaintiff] has a loss of $100 or more or her cumulative loss reaches $100 within the 90 day probationary period and a correction is not made to reverse these losses within 7 business days of happening, [Plaintiff] will face further disciplinary action up to termination. Also, after the probation period ends and there continue to be Loss Counseling Notices sent, [Plaintiff] may be subject to termination without another probationary period.

(Spencer Dep. Ex. 33.)

During this timeframe—between May 2007 and January 2008), Plaintiff claims that Perko and Office Manager Heather Stone made discriminatory comments about Plaintiffs' age and disability. For example, Plaintiff testified that Stone criticized Plaintiff's "flailing

---

[5] August 14, 2007, August 16, 2007, August 17, 2007 (Spencer Dep. Exs. 26, 28, 29) and possibly August 23, 2007 (Stone Dep. 75-77, Ex. 6).

movements" when she would attempt to open the door for customers. (Spencer Dep. 47:7-22; 72:6-73:8.) These movements, Plaintiff alleges, resulted from vertigo associated with her Meniere's Disease. (*Id*.) Abraham Chacra, another CSL at the Bank, testified that Perko complained that Plaintiff was "too slow." (Chacra Dep. 60:10-19.) There is also evidence that Ahmed overheard two employees, including Kelly Reichle, the Brentwood Branch's Customer Service Leader, "snickering and laughing" and making fun of Plaintiff's hearing loss. (Ahmed Dep. 50:11-20.) Plaintiff also claims that Reichle told Plaintiff that she could not train young CSRs "because the young people could relate better to a younger person" and that Reichle also told Plaintiff that she was "taking too long to close the branch" because Plaintiff was "slow" and "older." (Spencer Dep. 21:15-23:12.)

G. **Plaintiff's FMLA Leave**

While working at the Brentwood Branch on September 4, 2007, Plaintiff was taken by ambulance to the hospital after suffering what initially appeared to be a heart attack. Plaintiff remained in the hospital until September 7, 2007, after being diagnosed with hypertension. Plaintiff's physician released her to return to work on September 17, 2007, and Plaintiff provided Perko with a note from her physician reflecting the same. (Reichle Dep. Ex. 4.)

The record indicates that Plaintiff was audited on September 17, 2007, the day she returned from her FMLA leave. Plaintiff's drawer again was out of balance. On September 19, 2007, Perko and Stone issued Plaintiff a written counseling requesting that she "[a]dhere to all cash handling policies and procedures[,] [m]ake sure all night deposits left in [her] responsibility are accurately and promptly processed[,] [and] [f]ollow branch policy for request for time off." (Spencer Dep. Ex. 40.)

H. **Plaintiff's Resignation in Lieu of Termination**

7

Plaintiff was audited again on September 24, 2007. Because her drawer was out of balance, the Bank's Retail Audit Department instructed the Branch Manager to perform "at least two surprise audits within the next month for [Plaintiff]." (Spencer Dep. Ex. 43.) Between September 19, 2007 and September 25, 2007, at Perko's instruction (Reichle Dep. 50:22-53:17), Reichle documented several allegations against Plaintiff, including that Plaintiff had a negative attitude, was not in a good mood on a regular basis, and that Plaintiff was allegedly whispering to coworkers. (Reichle Dep. Ex. 5.) Reichle does not recall documenting any other CSRs. (*Id*. at 53:18-20.)

On November 30, 2007, Plaintiff's fourth probationary period came to an end. At that time, Plaintiff was notified that if her performance returned to an unacceptable level within one year of removal from probation, her employment "may be terminated." (Spencer Dep. Ex. 44.) Around this time, Perko documented several "critical incidents" relating to Plaintiff, all of which occurred after Plaintiff returned from FMLA leave. (*Id*. Ex. 39.) Of the six critical incidents documented in the log, all but one was an alleged policy violation committed by Plaintiff. (*Id*.)

Plaintiff sustained outages on her cash drawer on December 21, 2007 and December 28, 2007, and she was again at a Level 4 loss. (Spencer Dep. Ex. 49.) Plaintiff maintains, and the record reveals, that part of her losses was later recovered. (Perko Dep. 158-160, Ex. 4.) At that time, Perko contacted the Human Resources Department, which recommended that Plaintiff be terminated. On January 10, 2008, Plaintiff was informed by Matt Justice, the Bank's District Sales Executive, and Perko that her employment with the Bank was to be terminated. During this meeting, Plaintiff alleges that Justice told Plaintiff that leaving the Bank would "improve [her] health." (Spencer Dep. 20:9-13.) The Bank offered Plaintiff the option of resigning in lieu of termination, which she accepted. Plaintiff's resignation was effective February 1, 2008.

8

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. A genuine issue for trial exists when the evidence is not "so one-sided that one party must prevail as a matter of law." *Id*. at 252.

## III. ANALYSIS

Plaintiff seeks to establish her claims under the ADA, the FMLA, and the ADEA based on circumstantial evidence. Claims based on circumstantial evidence under the ADA, the FMLA, and the ADEA are analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). *See, e.g., Talley v. Family Dollar Stores of Ohio, Inc.,* 542 F.3d 1099, 1105 (6th Cir. 2008) (applying the burden-shifting framework to an

9

ADA claim); *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) (applying the burden-shifting framework to a FMLA claim); *Martin v. Toledo Cardiology Consultants, Inc.,* 548 F.3d 405, 410-11 (6th Cir. 2008) (applying the burden-shifting framework to an ADEA claim).

Under the burden-shifting framework of *McDonnell Douglas,* the plaintiff must first establish a prima facie case under the relevant statute. *See McDonnell Douglas,* 411 U.S. at 802; *see, e.g., Martin,* 548 F.3d at 410-11. Once the plaintiff has established a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision. *See Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1113-14 (6th Cir. 2001) (stating that "[a] plaintiff's burden in establishing a prima facie case is not intended to be an onerous one") (citation omitted). If the defendant makes the appropriate showing, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason was a pretext for discrimination. *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-55 (1981). To establish that the defendant's reason is pretext, the plaintiff must generally show: (1) that the proffered reason has no basis in fact; (2) the reason did not actually motivate the defendant's challenged conduct; or (3) the reason was insufficient to warrant the challenged conduct. *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 576 (6th Cir. 2003) (en banc).

Accordingly, the Court will first analyze whether plaintiff has stated a prima facie case under the ADA, the FMLA, and the ADEA. If the Court finds that plaintiff has stated a prima facie case under any of these statutes, the Court will then analyze whether Defendants have proffered a legitimate, non-discriminatory reason for Plaintiff's discharge. If so, the Court will inquire as to whether a reasonable finder of fact could find that Plaintiff has shown that this proffered reason was a pretext for discrimination.

### A. Disability Discrimination Claims

In Counts IV and V of her Complaint, Plaintiff alleges that Defendants discriminated against her due to her disability in violation of the ADA and Chapter 4112 of the Ohio Revised Code by terminating her employment. Because the ADA and Ohio disability discrimination actions require the same analysis, the Court will analyze those claims together under the ADA's framework. *See Mahon v. Crowell,* 295 F.3d 585, 589 (6th Cir. 2002); *Martin v. Barnestille Exempted Vill. Sch. Dist. Bd. of Educ.,* 209 F.3d 931, 934 n. 2 (6th Cir. 2000); *Maddox v. Univ. of Tenn.,* 62 F.3d 843, 846 n. 2 (6th Cir. 1995).

To establish a prima facie case that she was terminated in violation of the ADA, Plaintiff must show that: (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse employment action; (4) the employer knew or had reason to know of her disability; and (5) after termination, the position remained open, or Plaintiff was replaced by a non-disabled employee. *Hopkins v. Elec. Data Sys. Corp.,* 196 F.3d 655, 660 (6th Cir. 1999).

Defendants argue that Plaintiff fails to establish a prima facie case because 1) she is not disabled under the statute and 2) she is not otherwise qualified for the position.

#### 1. Disabled Within the Meaning of the ADA

Under the ADA as it existed in January of 2008,[6] when Defendants terminated Plaintiff's employment, a disability was defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an

---

[6] The ADA was amended by the ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553 (2008) ("ADAAA"). The ADAAA became effective on January 1, 2009 and it does not apply retroactively. *See, e.g., Verhoff v. Time Warner Cable, Inc.,* 299 F. App'x 488, 494 (6th Cir.2008); *E.E.O.C. v. Agro Distribution, LLC,* 555 F.3d 462, 469 n. 8 (5th Cir. 2009); *Vaughn v. Rent-A-Center, Inc.,* No. 2:06-cv-1027, 2009 WL 723166, at *3 n. 1 (S.D. Ohio Mar. 16, 2009).

impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). From the briefing, Plaintiff appears to be arguing that she is considered disabled under the first possibility.

### a. Substantially Limiting Impairment

The Supreme Court has set forth a three-step approach to analyzing the ADA's definition of a disability:

> First, the Court considers whether a condition is an impairment; second, it identifies the life activity that the plaintiff relies upon and determines whether it constitutes a major life activity; and third, the Court asks whether the impairment substantially limits the major life activity.

*Williams v. Stark County Bd. of County Comm'rs,* 7 F. App'x 441, 445 (6th Cir. 2001) (citing *Bragdon v. Abbott,* 524 U.S. 624, 630-31 (1998)). A limitation is substantial if a person is "[s]ignificantly restricted as to the condition, manner or duration under which [she] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii). Whether an individual meets the definition of disability requires an individualized inquiry. *Sutton v. United States Air Lines, Inc.*, 527 U.S. 471, 483 (1999). Courts consider the nature and severity of the impairment, the impairment's duration, and the permanency or long-term impact resulting from the impairment. *See* 29 C.F.R. § 1630.2(j)(2).

First, the parties do not dispute that Meniere's disease is a physical impairment. As to the second factor, Plaintiff claims that Meniere's disease substantially limits her major life activity of hearing. (Doc. 29 at15.) Hearing is recognized as a major life activity. 29 C.F.R. § 1630.2(I) ("Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, *hearing*, speaking, breathing, learning, and working.") (emphasis added).

12

The dispositive question, therefore, is whether Plaintiff has produced sufficient evidence to create a jury question on whether she is "significantly restricted as to the condition, manner or duration" under which she can hear as compared to the average person. Defendants point out that, although Plaintiff suffers hearing loss, she has testified that she did not wear a hearing aid and that her hearing loss did not affect her ability to hear customers or impact her ability to perform her teller duties.

Plaintiff testified that Meniere's disease has caused total hearing loss in her left ear, has reduced her hearing in her right ear (Spencer Dep. 44:14-45:3, 74:4-10) and causes her to suffer from vertigo and constant tinnitus (*id*. at 124:9-11). Plaintiff also testified that she does not wear a hearing aid because it would be "of no value." (*Id*. at 45:5.) The record reveals that Plaintiff's doctor characterized her hearing loss as "profound." (*Id*. Ex. 17.) Although Plaintiff testified that her hearing loss did not affect her ability to perform her teller duties, Plaintiff went on to testify that she "developed a pattern" so that her hearing loss would not interfere with her job. (*Id.* at 45:8-12.) For example, Plaintiff testified that she had to be "directed to [a customer's] face" so that she could watch them speak. (*Id*.) She also testified that she "frequently did ask people to repeat" themselves and that her hearing loss made her job "more challenging" because she cannot "hear peripherally." (*Id*. at 45:8-46:1.) There is nothing in the record suggesting that Plaintiff's hearing loss is temporary.

The Court concludes that Plaintiff has raised a genuine issue of fact as to whether her impairment substantially limits her ability to hear, as compared to an average individual. *See, e.g.*, *Perkins v. Hook-Superx, Inc*., No. 05-cv-818, 2007 WL 1577751, *6 (S.D. Ohio May 30, 2007) (denying summary judgment and stressing that the determination of whether a plaintiff's hearing disability is substantially limiting is a "fact-intensive one" and "must be made on a case

13

by case basis"); *Boskett v. Long Island Railroad*, No. 00-CV-7352 (RJD)(JMA), 2004 WL 1305746, at *4-5 (E.D.N.Y. June 4, 2004) (denying summary judgment stating, "determining whether a hearing impairment is substantial necessitates a comparison between the plaintiff and a non-impaired individual. Fact-intensive inquiries such as this often require resolution at trial."); *Connolly v. Biderman Industries U.S.A., Inc*., No. 95 Civ. 1791, 1998 WL 305643 (S.D.N.Y. June 9, 1998) (denying summary judgment stating, "[w]hether plaintiff's hearing disability 'substantially limits' one or more of plaintiff's major life activities is an issue of fact to be decided at trial.").

### 2. Otherwise Qualified for the Position

In order to establish the second element of her ADA claim, Plaintiff need only demonstrate that she was objectively qualified for the position. *Wexler*, 317 F.3d at 574-76; *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651, 660 (6th Cir. 1999). "[A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case." *Wexler*, 317 F.3d at 574; *Cline,* 206 F.3d at 660. Instead, courts must analyze the qualifications of the plaintiff independent of the defendant's nondiscriminatory reason for termination. Wexler, 317 F.3d at 574-75; *Cline,* 206 F.3d at 660-61.

Defendants cite deficiencies in Plaintiff's job performance in arguing that she was not otherwise qualified for the position. (Doc. 22.) However, these are the same reasons given by Defendant for terminating her, and, therefore, cannot be considered in determining whether she was qualified for her position. For purposes of summary judgment, Plaintiff has put forward evidence that she meets the minimum objective criteria required for a CSR. Specifically, in her seven years of employment, Plaintiff received multiple accolades for exceeding her referral goals

14

and for outstanding customer service (Justice Dep. 55:4-56:9; Burchett Dep. 93:4-94:3), and was even promoted in 2005.

As stated above, for purposes of summary judgment, Plaintiff sets forth sufficient evidence to demonstrate that she is disabled within the meaning of the ADA and that she was otherwise qualified for the position she held. Defendants make no argument as to the three remaining elements that Plaintiff must show to establish a prima facie case of disability discrimination. The Court construes Defendants' silence to mean they concede Plaintiff's ability to establish those elements, at least as pertains to Defendants' Motion for Summary Judgment. Accordingly, the Court finds that Plaintiff has set forth sufficient facts to state a prima facie case for disability discrimination.

### B.     FMLA Retaliation Claim

To establish a prima facie case of unlawful retaliation under the FMLA, Plaintiff must show that (1) she availed herself of a protected right under the FMLA, (2) Defendants knew of her exercise of a protected right, (3) she was adversely affected by an employment decision made by Defendants, and (4) there was a casual connection between the exercise of the protected right and the adverse employment action. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001). As to the fourth element, "[t]he burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).

Defendants argue that Plaintiff failed to demonstrate a prima facie case of retaliation because she did not produce evidence of a causal connection between her FMLA leave and her termination. (Doc. 22-1.) Specifically, Defendants argue that the "more than four month gap"

15

between Plaintiff's FMLA leave and termination "does not give rise to a temporal proximity." (*Id.*)  Even so, Defendants recognize that temporal proximity, in connection with other evidence of retaliation, can suffice to prove causation.  (Doc. 22-1, *citing Dixon*, 481 F.3d 324).

Plaintiff has submitted evidence that she was subjected to substantial scrutiny after she engaged in protected activity.  Plaintiff took FMLA leave from September 4, 2007 to September 17, 2007.  Plaintiff was audited on the day she returned from FMLA leave.  On September 19, 2007, Perko and Stone issued Plaintiff a written counseling specifically requesting that she "[f]ollow branch policy for request for time off."  (Spencer Dep. Ex. 40.)  Between September 19, 2007 and September 25, 2007, at Perko's instruction (Reichle Dep. 50:22-53:17), Reichle documented several allegations against Plaintiff, including that Plaintiff had a negative attitude, was not in a good mood on a regular basis, and that Plaintiff was allegedly whispering to coworkers.  (Reichle Dep. Ex. 5.)  Shortly thereafter, in December of 2007, Perko documented five "critical incidents" relating to Plaintiff, all of which occurred after Plaintiff returned from FMLA leave.  (Spencer Dep. Ex. 39.)  Finally, on January 10, 2008, when Plaintiff was terminated, Plaintiff alleges that Justice told her that leaving the Bank would "improve [her] health."  (Spencer Dep. 20:9-13.)

Thus, Plaintiff has submitted sufficient evidence of causation between the retaliatory action and the protected activity so as to create an inference of retaliatory motive.

### C. Age Discrimination Claims

In Counts I and II of her Complaint, Plaintiff alleges that Defendants discriminated against her due to her age in violation of the ADEA and Chapter 4112 of the Ohio Revised Code.  Because the ADEA and Ohio age discrimination actions require the same analysis, the Court will analyze these claims together under the ADEA's framework.  *Ercegovich v. Goodyear Tire &*

*Rubber Co.*, 154 F.3d 344, 357 (6th Cir. 1998) ("Under Ohio law, the elements and burden of proof in a state age-discrimination claim parallel the ADEA analysis.").

The ADEA prohibits an employer from discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's age.  29 U.S.C. § 623(a)(1). To establish a prima facie case of age discrimination under this analysis, Plaintiff bears the burden of demonstrating that 1) she was a member of a protected class; 2) she suffered an adverse employment action; 3) she was qualified for the position held; and 4) she was replaced by someone outside of the protected class or she was treated differently than similarly situated employees outside the protected class.  *See Martin,* 548 F.3d at 410.  Plaintiff retains the ultimate burden of proving that age was the "but-for" cause of the challenged employer decision.  *Gross v. FBL Fin. Services, Inc.,* --- U.S. ----, 129 S.Ct. 2343, 2351 (2009).  That is, Plaintiff must prove that Defendants fired her "because of" her age.  *See* 29 U.S.C. § 623(a)(1); *cf. Gross*, 129 S.Ct. at 2350-51.

For purposes of summary judgment, Defendants appear to concede that Plaintiff has met her burden in establishing a prima facie ADEA discrimination claim. (Doc. 22-1.)

**D.     Legitimate Non-Discriminatory Explanation and Pretext**

Because Plaintiff has established a prima facie case of discrimination under the ADA, the FMLA, and the ADEA, the burden shifts to Defendants to proffer a "legitimate, non-discriminatory reason" for its discharge of Plaintiff.  *McDonnell,* 411 U.S. at 802.  Defendants assert that Plaintiff's inability to balance her cash drawer and her repeated cash outages led to her termination.   For purposes of summary judgment, the parties appear to accept that Defendants offered a facially non-discriminatory reason for their actions.  The threshold question is thus

17

whether Defendants' proffered nondiscriminatory reason was a pretext designed to mask intentional discrimination.

Plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate Defendants' action, or (3) was insufficient to motivate Defendants' action. *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994). The Sixth Circuit has cautioned that courts should "avoid formalism" in the application of this test, "lest one lose the forest for the trees." *Chen v. Dow Chem. Co.,* 580 F.3d 394, 400, n. 4 (6th Cir. 2009). Pretext, the court observed, "is a commonsense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." *Id.* The *Manzer* test can be distilled to one simple requirement: Plaintiff must produce sufficient evidence such that a reasonable jury could doubt Defendants' stated reasons for its actions. *Id.*

Plaintiff attempts to demonstrate pretext under the first and second methods. As to the first showing, the record contains ample evidence that Defendants' stated reason for the discharge was based in fact. The Bank had a policy requiring that tellers balance their cash drawers at the end of the day and properly process customer transactions to avoid incurring outages. The record shows that Plaintiff sustained multiple losses and outages during her employment at the Bank, resulting in at least six separate written corrective actions and four probationary periods prior to her termination. Plaintiff does not dispute these disciplinary actions, nor does she claim that they were discriminatory.[7]

---

[7] Plaintiff claims that Defendants "did not follow written procedures when auditing [her]" because she was not permitted to witness one of the audits. (Spencer Dep. 17-16.) Even accepting Plaintiff's claim as true, this fact is immaterial given that Plaintiff does not dispute the

18

Plaintiff next argues that her balancing issues did not actually motivate Defendants' actions; rather, Plaintiff argues, Defendants targeted her and ultimately terminated her because of her age, her disability, and her exercise of FMLA leave. In support of this argument, Plaintiff cites the following evidence: Plaintiff testified that she was audited significantly more than other younger, nondisabled coworkers (Stone Dep. 75-77, Ex. 6; Ahmed Dep. 24:2-5); Reichle, the Brentwood Branch's Customer Services Leader, told Plaintiff that she could not train young CSRs "because the young people could relate better to a younger person" (Spencer Dep. 21:15-22:1); Plaintiff was audited the day she returned from FMLA leave; Plaintiff was disciplined two days after returning from FMLA leave for failing to "[f]ollow branch policy for request[ing] for time off" (*id.* Ex. 40); at Perko's instruction, Reichle documented Plaintiff five times between September 19, 2007 and September 25, 2007 (Reichle Dep. 50:22-53:17), most of which involved minor, arguably insignificant incidents; Reichle told Plaintiff that she was "taking too long to close the branch" because Plaintiff was "slow" and "older" (Spencer Dep. 23:2-13); and Perko also documented five "critical incidents" involving Plaintiff in the month of December 2007 (*id.* Ex. 39). Further, Plaintiff points to the fact that although she was allegedly terminated for outages occurring in December, part of that outage was recovered prior to her termination. (Doc. 26; Perko Dep. 158-160.) Finally, when Plaintiff was informed that her position with National City was terminated, National City's District Sales Executive told Plaintiff that leaving the bank would "improve [her] health." (Spencer Dep. 20:9-13.)

---

outcome of this audit. (Spencer Dep. 175:19-21, 177:21-178:3, 178:14-15, 198:4-7, 199:10-12, 201:18-19.)

Construing the evidence in a light most favorable to Plaintiff, as it must do at this stage of the proceedings, the Court finds that Plaintiff has produced sufficient evidence such that a reasonable jury could doubt Defendants' stated reasons for its actions.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion for summary judgment as to the FMLA interference and defamation claims and **DENIES** Defendants' motion for summary judgment as to the remaining claims.

IT IS SO ORDERED.

S/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Judge